■ In the Matter of VESTAL EMPLOYEES ASSOCIATION, NEA/NY, NEA, Appellant, v PUBLIC EMPLOYMENT RELATIONS BOARD OF THE STATE OF NEW YORK et al., Respondents. [688 NYS2d 712] —Spain, J. Appeal from a judgment of the Supreme Court (Lamont, J.), entered December 15, 1997 in Albany County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 78, to review a determination of respondent Public Employment Relations Board finding that respondent Vestal Central School District had not committed an improper employer practice.

. In September 1995 respondent Vestal Central School District (hereinafter the District) unilaterally and permanently subcontracted its printing services to the Broome-Tioga Board of Cooperative Educational Services (hereinafter BOCES). The only employee affected by this transfer of services was Joseph

Misulich, a member of petitioner's bargaining unit, who had been employed as the sole duplicating machines operator for the District. In November 1995 petitioner filed an improper practice charge with respondent Public Employment Relations Board (hereinafter PERB). After a hearing the Administrative Law Judge (hereinafter ALJ) determined that the District committed an improper practice (*see*, Civil Service Law § 209-a [1] [d]) by unilaterally and without collective bargaining subcontracting out printing services exclusively performed by a bargaining unit employee. Specifically, the ALJ found that printing services were not covered by Education Law § 1950 (4) (d) and thus did not fall within the implied exception to mandatory collective bargaining embodied in Education Law § 1950 (4) (d), as interpreted by the Court of Appeals in *Matter of Webster Cent. School Dist. v Public Empl. Relations Bd.* (75 NY2d 619) (hereinafter *Webster*).

PERB reversed the ALJ's decision and dismissed the charge, based upon *Webster*. Petitioner then commenced this CPLR article 78 proceeding seeking to annul PERB's determination. Supreme Court confirmed PERB's determination in its entirety. Petitioner now appeals.

At the time of the events pertaining to petitioner's improper practice charge,* Education Law § 1950 (4) provided, in relevant part, as follows:

"The board of cooperative educational services shall have the power and duty to * * *

"d. At the request of component school districts, and with the approval of the commissioner of education, provide any of the following services on a cooperative basis: school nurse teacher, attendance supervisor, supervisor of teachers, dental hygienist, psychologist, teachers of art, music, physical education, vocational subjects, guidance counsellors, operation of special classes for handicapped children * * * pupil and financial accounting service by means of mechanical equipment; maintenance and operation of cafeteria or restaurant service for the use of pupils and teachers while at school, *and such other services as the commissioner of education may approve*" (emphasis supplied).

The issue presented on this appeal is whether printing services are included within "such other services" which the District may subcontract to BOCES with the Commissioner's approval, without engaging in collective bargaining. Notably, printing services are not listed in Education Law § 1950 (4) (d).

---

* The statute was amended by the Laws of 1996 (ch 747, § 16).

The issue before us is one of statutory construction, a question of law for the courts, and thus no special deference is due PERB's statutory interpretation (*see, Matter of City of Schenectady v New York State Pub. Empl. Relations Bd.*, 85 NY2d 480, 485; *Matter of Rosen v Public Empl. Relations Bd.*, 72 NY2d 42, 47-48; *Matter of Town of Carmel v Public Empl. Relations Bd.*, 246 AD2d 791, 792).

The BOCES statute (Education Law § 1950 *et seq.*)—which is designed to encourage these cooperative agreements and which is not part of the Taylor Law (Civil Service Law § 200 *et seq.*)—is devoid of any language which specifically addresses the issue of whether a school district's decision to take advantage of such a cooperative arrangement is subject to mandatory collective bargaining. However, the Court of Appeals directly addressed this issue in *Webster*, wherein it interpreted a 1984 amendment to the BOCES statute. The 1984 amendment added Education Law § 1950 (4) (bb) which states, in part, as follows: "Boards of cooperative educational services may provide academic and other programs and services in the school year on a cooperative basis, including summer programs and services." The court concluded that Education Law § 1950 (4) (bb) clearly manifested a legislative intent that a school district's decision to subcontract its academic summer school instructional program to a BOCES was not subject to mandatory collective bargaining (*Matter of Webster Cent. School Dist. v Public Empl. Relations Bd., supra*, at 628). The court took notice of the "finely calibrated legislative scheme" embodied in Education Law § 1950 requiring joint action by at least two school districts (and conceivably more) and the Commissioner's approval, on a "tight timetable", as some proof of the legislative intent not to mandate bargaining (*Matter of Webster Cent. School Dist. v Public Empl. Relations Bd., supra*, at 627-628). While expressly declining to decide whether this procedural aspect of Education Law § 1950, standing alone, was sufficient evidence of the legislative intent not to mandate bargaining, the court was persuaded to that conclusion by the fact that a component of the 1984 amendment specifically addressed the subject of job protection for teachers in the event of a BOCES takeover (*Matter of Webster Cent. School Dist. v Public Empl. Relations Bd., supra*, at 628; *see*, Education Law § 1950 [4] [bb]; [5]; § 3014-a). Thus, the court's conclusion that bargaining was not required was based upon a two-prong rationale, aside from the procedural aspect of the statute: Education Law § 1950 (4) (bb) specifically enumerated cooperative arrangements involving summer academic teaching programs and provided statutory job protection for the affected teachers.

In view of the rationale employed, we conclude that the holding in *Webster* is limited to the subcontracting of teaching services which the Education Law expressly provides for in Education Law § 1950 (4) (bb), and which affords necessary job protection to teachers in Education Law § 1950 (4) (bb); (5) and § 3014-a. Indeed, *Webster* did not define the parameters of the Commissioner's authority to approve "such other services" for cooperative agreements under Education Law § 1950 (4) (d) of the BOCES statute—the subdivision at issue on this appeal. Also, *Webster* did not resolve the precise issue presented here regarding whether printing services are included in that clause covering "such other services as the commissioner of education may approve" (Education Law § 1950 [4] [d]).

In searching for the legislative intent underlying Education Law § 1950 (4) (d), we must first examine the words of the statute "both for their meaning as used in the specific section and in their context as part of the statutory scheme" (*see, Thoreson v Penthouse Intl.*, 80 NY2d 490, 496). As the Court of Appeals explained in *Webster*: "While legislative expression is the best evidence of legislative intent, it is not the only evidence; legislative intent may also be implied from the words of an enactment. It should be apparent, however, that in order to overcome the strong State policy favoring the bargaining of terms and conditions of employment, any implied intention that there not be mandatory negotiation must be 'plain and clear' (*Syracuse Teachers Assn. v Board of Educ.*, 35 NY2d 743, 744), or 'inescapably implicit' in the statute (*Matter of Cohoes City School Dist. v Cohoes Teachers Assn.*, 40 NY2d 774, 778; *see also, Matter of City School Dist. v New York State Pub. Employment Relations Bd.*, 74 NY2d 395). Anything less threatens to erode and eviscerate the mandate for collective bargaining" (*supra*, at 627).

Education Law § 1950 (4) (d) contains a very specific list of educational and pupil-oriented services which a district may subcontract to a BOCES. Critically, it does not list printing services in contrast to teaching services which are enumerated in Education Law § 1950 (4) (d) and (bb). At the end of the list of specific services which may be subcontracted, Education Law § 1950 (4) (d) authorizes a BOCES to provide on a cooperative basis "*such other* services as the commissioner of education may approve" (emphasis supplied). In our view, interpreting the phrase "such other services" as an unqualified, carte blanche grant to the Commissioner to approve any plan of contracted-out services of whatever nature without collective bargaining is unwarranted. A holding that nonenumerated

printing services fall within Education Law § 1950 (4) (d) and that collective bargaining requirements were implicitly waived would undermine the "strong" and "sweeping" policy of this State reflected in the Taylor Law requiring collective bargaining between public employers and employees with respect to the terms and conditions of employment in the absence of any "plain" or "clear" evidence of legislative intent to effect such a significant, open-ended waiver of the bargaining requirement (*see, Matter of City of Schenectady v New York State Pub. Empl. Relations Bd.*, 85 NY2d 480, 485-486, *supra*; *Matter of Webster Cent. School Dist. v Public Empl. Relations Bd.*, *supra*, at 627; *see also*, Civil Service Law § 200 *et seq.*). Notably, the legislative history of these provisions does not contain any support for such an expansive interpretation of this phrase.

We agree with the ALJ that the phrase "such other services" in Education Law § 1950 (4) (d) should be read in conjunction with the words preceding it which enumerate specific educational and nurturing services, and comparable services closely related thereto; it should not be interpreted as an all-encompassing limitless grant to the Commissioner to contract out printing services or to replace positions requiring bargaining, thereby waiving bargaining for any and all services by the simple expedient of contracting with a BOCES (*see, e.g., Thoreson v Penthouse Intl.*, 80 NY2d 490, 496-497, *supra* [holding that the phrase " 'such other remedies' " referred back to the preceding clause and should not be read as an all-encompassing grant]). This comports with the *ejusdem generis* canon of statutory construction, by which general language of a statute is limited by specific enumerated phrases which have preceded it. This canon is appropriately applied where, as here, the legislative intent is not clear from the language and there is no clear contrary intention expressed (*see, Barsh v Town of Union*, 126 AD2d 311, 313; *see also*, McKinney's Cons Laws of NY, Book 1, Statutes § 239).

Analyzing the phrase "such other services" in the context of the BOCES statutory scheme and with due regard for the protections afforded by the Taylor Law (*see*, Civil Service Law § 200 *et seq.*), we conclude that it does not authorize the Commissioner to approve the subcontracting of printing services without collective bargaining. Indeed, had the Legislature intended or contemplated that services such as printing be unilaterally contracted out, it would have at least included them with the same particularity with which it listed "cafeteria or restaurant service" or "financial accounting services by means of mechanical equipment" (Education Law § 1950 [4]

[d]), but did not do so. That the Legislature amended the BOCES statute in 1996 by adding subparagraph (2) to Education Law § 1950 (4) (d) so as to specifically exclude maintenance and municipal services from the BOCES statute further fortifies our conclusion that the Legislature never intended the phrase "such other services" to be an unqualified grant of authority to the Commissioner to waive collective bargaining for services bearing no relationship to those specifically listed in Education Law § 1950 (4) (d).

A careful review of the BOCES statute suggests that, unlike Education Law § 1950 (4) (bb) at issue in *Webster* (*supra*), in which the Legislature provided specific protections for the teachers impacted by the subcontracting of a summer program to a BOCES, there is no such protection specified for the impact on support staff such as Misulich. We reject respondents' contention that Civil Service Law § 70 (2), which provides a statutory scheme to protect the seniority and accrued benefits of employees whose *function* is *transferred* from one civil division of the State to another, is comparable to that afforded to teachers by Education Law § 3014-a. Notably, this contract did not involve a mere transfer of a job function, but rather involved unilateral subcontracting of all printing services to BOCES. That the arrangement had little effect on the day-to-day duties of the sole printer is irrelevant to our analysis. Thus, the statutory job protection prong of *Webster's* rationale is not present in this case to support a finding of plain and clear legislative intent to exclude such contracts from mandatory bargaining.

Notwithstanding the absence of statutory protection for printing staff, PERB argues that given the strict timetable governing applications under Education Law § 1950 (4) (d), if districts are required to negotiate such applications, the bargaining processes in the various requesting districts may never be completed in time to meet the statutory deadline for submission, thereby undermining the intent of the statute to expand use of such cooperative arrangements. The Court of Appeals in *Webster* expressly left open the issue of whether the finely calibrated procedure and tight timetable set forth in Education Law § 1950 (4) (d) are sufficient bases, by themselves, upon which to find plain and clear legislative intent to negate the compelling Taylor Law mandate for collective bargaining (*Matter of Webster Cent. School Dist. v Public Empl. Relations Bd.*, *supra*, at 627-628). While the question is an open one, as a matter of policy and statutory interpretation we decline to so expansively interpret the phrase "such other

services" in Education Law § 1950 (4) (d) in order to find an implicit waiver of collective bargaining requirements, based solely upon a standard which turns on whether a particular statutory scheme is sufficiently "finely calibrated". Such conjectural analysis does not satisfy the requirement that the Legislature's intent to forego mandatory bargaining be plain and clear from the statute (*see, Matter of Webster Cent. School Dist. v Public Empl. Relations Bd.*, *supra*, at 627). Of course, nothing in our decision should be read to preclude bargaining between public employers and employees to achieve subcontracting of services by a district to a BOCES.

Thus, given the strong policy favoring mandatory bargaining and the dual rationale of *Webster (supra)*, we conclude that the District is obligated to negotiate the challenged arrangement pursuant to the Taylor Law. Accordingly, we reverse the holding of Supreme Court.

Mikoll, J. P., Yesawich Jr., Carpinello and Graffeo, JJ., concur. Ordered that the judgment is reversed, on the law, without costs, determination annulled and matter remitted to respondent Public Employment Relations Board for further proceedings not inconsistent with this Court's decision.